UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
                          )
v.                        )      Criminal No. 17-10023-IT
                          )
                          )
TAKARI ELLIOTT            )

## GOVERNMENT'S SENTENCING MEMORANDUM

On January 19, 2017, counsel in this case consummated a plea agreement that had been the subject of careful negotiation and provided the defendant with certainty regarding the sentence that will be imposed.  If accepted by this Court, the defendant will remain under criminal justice system supervision for nearly five and a half years (i.e., 30 months' incarceration *plus* three years of supervised release).

The proposed sentence represents a 7-month variance under the 37-46 month guideline range calculated in the Presentence Report ("PSR").  PSR at ¶ 93.  The recommended sentence reflects that the defendant agreed to plead promptly to an Information and has accepted responsibility for all the drug transactions involving him in the underlying investigation, whether charged or not. For all these reasons, the government urges the Court to accept the Rule 11(c)(1)(C) plea and sentence the defendant to 30 months in prison to be followed by 3 years of supervised

1

release with the various judicial recommendations and requested special conditions of Supervised Release described more fully below.

### PROPOSED JUDICIAL RECOMMENDATIONS

Any plan designed to give the defendant the maximum chance at positive life change must of course begin with the terms and conditions of his incarceration. E.g., United States v. Gautier, 590 F. Supp. 2d 214 (D. Mass. 2008) ("I have required Probation to devise a recommended plan for him, both as a recommendation for the Bureau of Prisons during the period of his incarceration and as a template for his supervised release afterwards. Studies suggest the significance on recidivism of a consistent plan, beginning in prison and extending into reentry. Laurie Robinson & Jeremy Travis, 12 Fed. S.R. 258 (2000)").  Although the Defendant will not be in BOP custody for a terribly long time if the plea agreement is accepted, the government is requesting that the Court make the following recommendations to the Bureau of Prisons: (i) that the defendant be given any available substance abuse treatment; and,(ii) that the defendant be given any available vocational training (so that the defendant may have maximum job skills when he is released).

## SUPERVISED RELEASE CONDITIONS

The plea agreement calls for a period of 3 years of supervised release.  It is hoped that this period will be sufficient to provide Probation with ample time to assist him once he is released.  If the defendant is unable to comply with his Supervised Release conditions once he is back out on the street, the Court would have the ability to extend the applicable supervised release period under 18 U.S.C. §3583 or revoke the defendant's Supervised Release and re-incarcerate him if necessary.

In addition to the length of supervised release provided for in the plea agreement, the government is asking that the Court impose the following special conditions to both assist the defendant and help protect public safety:

**A.  Drug testing**.  Defendant shall submit to a drug test within 14 days after his release from custody and to such additional drug tests (not to exceed 104 per year) as Probation believes may be required during the entire period of supervised release.

**B.  Drug counseling**.  Defendant shall be required to participate in any drug treatment that Probation considers to be appropriate and shall be required to contribute to the cost of

such treatment during the period of Supervised Release. <u>See</u> PSR
at ¶¶84, 85.

**C. Residence.**  It appears that the defendant will have an
appropriate residence when he is released from prison.  PSR at
¶¶62-63 & 83.  If for some reason he does not, then he should be
required to reside in a Residential Re-entry Center until a
suitable residence is found and during such time he should be
required to comply with the Rules of that facility.

**D. Curfew.**  First 9 months on the street, a curfew from
9pm-6am enforced by electronic monitoring that Probation can
adjust for work or school. <u>See, e.g</u>., "Maximum Impact: Targeting
Supervision on Higher Risk People, Places and Times," Pew Center
for the States Public Policy Brief (March, 2009) (concluding
that Probationers are "at the highest risk of re-arrest during
the first few months on community supervision," that arrest
rates after 15 months were substantially lower, and thus
recommending that probation resources be "front end loaded" to
achieve maximum effect).

**E. MRT.** Attend MRT (or any other cognitive behavioral
program) as directed by Probation.

**F. RESTART.**    Recommendation for RESTART Program.

**G. Geographic Restriction.** The government is also seeking

4

the Geographic Restrictions attached as Exhibit 1 that will keep
the defendant away from areas that have contributed to his
historic offending and thereby both enhance public safety and
help protect the defendant from running into new opportunities
to commit crime.

The rationale for such a restriction has been explained as
follows:

> Recidivism is due to offenders' retaining criminogenic
> motivation or propensity and their having access to
> opportunities for crime.  Thus, to reduce re-
> offending, an important task for a probation or parole
> agency is to provide or place offenders into treatment
> programs, based on the principles of effective
> rehabilitation, that diminish their propensity for
> crime.  *The other task, however, is for probation and*
> *parole officers to reduce offenders' access to crime*
> *opportunities.*

Cullen et al, "Environmental Corrections "A New Paradigm for
Effective Probation and Parole Supervision" 66 Federal Probation
28 (2002) (hereinafter referred to as "Cullen")(emphasis
supplied).  Because both the literature and common sense show
that opportunities for crime will be presented whenever a
Defendant returns to a high crime area in which his offending
began and grew (and in which his street credentials and sense of
self may have been based on that very criminality), removing him
from that area can reduce both the opportunities for further
crime and the expectation from those around him that he will re-

offend.  Thus, "[t]he effectiveness of probation and parole supervision will be increased to the extent that officers systematically. . . reduce the extent to which offenders are tempted by and come into contact with opportunities for crime." Id. at 31. See also La Vigne et al., "Prisoner Reentry and Community Policing: Strategies for Enhancing Public Safety," Washington D.C.: Urban Institute Justice Policy Center, Mar. 2006, at 25 ("most potential offenders are not highly motivated to commit crime but do so when they are presented with opportunities to offend easily."); Dickey et al, "Promoting Public Safety: A Problem-Oriented Approach To Prisoner Reentry in Prisoner Reentry and Community Policing: Strategies for Enhancing Public Safety," Washington D.C.: Urban Institute Justice Policy Center, May 2004, at 61-62 ("when offenders first reenter communities, they themselves are vulnerable, for all of the reasons that have been suggested in literature on reentry: mental health problems, lack of family connections, drug and alcohol addictions, lack of education and employment. . .Fixing these problems is often implausible. . . .Instead, we can alter environments [and] remove temptations. . . ").

As commonsensical as these notions are, effective implementation is equally straightforward.  The literature

suggests that narrow restrictions are more effective-
restrictions precluding the Defendant from being with
particular, identified people or specifically delineated areas
that have previously led him into crime. Cullen at 33
(recommending that probation officers attempt "to disrupt
routine activities that increase crime opportunities" that are
based on the Defendant's past offending by, among other things,
prohibiting contact with specific people (e.g., past
co-offenders) and "prohibiting traveling on specific streets"
(e.g., areas of past criminality outlined on a map given to the
offender). That is what the government seeks to do here.[1]

---

[1] Appellate courts have routinely upheld such restrictions as a
condition of probation or supervised release whenever, as here,
the restriction served as a deterrent to protect the victimized
community and/or rehabilitate the Defendant based on his prior
offending.  See United States v. Garrasteguy, 559 F.3d 34 (1st
Cir. 2009) (affirming on plain error review 12-year restriction
from Suffolk County imposed on Defendant who sold drugs at
Bromley Heath Housing Development); United States v. Watson,
582 F.3d 974 (9th Cir. 2009)(validating restriction that
prevented Defendant from entering city and county of San
Francisco without the prior approval of his Probation Officer);
United States v. Cothran, 855 F.2d 749 (11th Cir. 1988)
(validating a probation restriction that prevented Defendant,
convicted of cocaine distribution to minors, from traveling to
Fulton County, Georgia, because his return to a high-crime
neighborhood in southeast Atlanta would likely result in his
continued criminal activity and the endangerment of neighborhood
youth); United States v. Sicher, 239 F.3d 289, 292 (3d Cir.
2000) (upholding a supervised release restriction, after various
drug convictions, that covered two counties in the Allentown,
Pennsylvania, area because the "territorial limitation [was]

Both the offenses summarized in the PSR and his BPD
Reports show that much of the defendant's offending and other
interactions with the Boston Police since his return to
Massachusetts come from the area of the proposed exclusion
zone. See, e.g. PSR at 49 (conditions of probation in state
court gun case required that defendant stay out of some of the
very same area that the government seeks to exclude him from
here). The government is asking that the Geographic restriction

---

clearly intended to promote [Defendant☐s] rehabilitation by
keeping [Defendant] away from the influences that would most
likely cause her to engage in further criminal activity"). In
approving the much broader geographic restriction imposed in
Garrastequy, the First Circuit described the legal framework for
such conditions as follows:

> District courts have significant flexibility to impose
> special conditions of supervised release.  A district court
> may impose as a condition of supervised release most
> discretionary conditions identified in 18 U.S.C. § 3563(b),
> or any other condition the court deems appropriate. All
> such conditions, however, must be "reasonably related" to
> the factors set forth in § 3553(a), may involve "no greater
> deprivation of liberty than reasonably necessary" to
> achieve the purposes of §§ 3553(a)(2)(c), (a)(2)(D), (viz.
> to protect the public and promote the rehabilitation of the
> Defendant), and must be consistent with any pertinent
> policy statement of the United States Sentencing
> Commission. 18 U.S.C. § 3583(d); see also United States v.
> York, 357 F.3d 14, 20 (1st Cir.2004).

559 F.3d at 41 (footnotes omitted).  A court should also explain
the reason for imposing the conditions and, in doing so, discuss
how they relate to the statutory sentencing factors contained in
18 U.S.C. §3553.  See United States v. Thompson, 777 F.3d 368,
373-74 (7th Cir. 2015).

be subject to modification so that Probation can allow the defendant to visit his children so long as they remain inside the exclusion zone and he is in compliance with his conditions of release.  In this regard, the government notes that the defendant and the mother of his child hope to move out of the Boston area which will eliminate the need for any visitation schedule.

Respectfully submitted,

WILLIAM D. WEINREB
ACTING UNITED STATES ATTORNEY

By: /s/ John A. Wortmann, Jr.
JOHN A. WORTMANN, JR.
Assistant U.S. Attorney
One Courthouse Way
Boston, MA 02210
617-748-3100

### CERTIFICATE OF SERVICE

The government hereby certifies that the foregoing was this day filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated as non-registered participants.

/s/ John A. Wortmann, Jr. 4-28-17
JOHN A. WORTMANN, JR.
Assistant U.S. Attorney